UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————————————

| | |
|---|---|
| PEPPERCO-USA, INC.<br>220 N. Fillmore Road<br>Coldwater, MI 49036<br><br>      Plaintiff<br><br>v.<br><br>THOMAS E. PEREZ, Secretary<br>United States Department of Labor<br>200 Constitution Avenue, N.W.<br>Washington, DC 20210<br><br>PORTIA WU, Assistant Secretary<br>Employment and Training Administration<br>United States Department of Labor<br>200 Constitution Avenue, N.W.<br>Washington, DC 20210<br><br>WILLIAM THOMPSON, Acting Administrator<br>Office of Foreign Labor Certification<br>United States Department of Labor<br>200 Constitution Avenue, N.W.<br>Washington, DC 20210<br><br>      Defendants | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

———————————————————————

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, PEPPERCO-USA, INC., through undersigned counsel, files the instant Complaint against Defendants, THOMAS E. PEREZ, Secretary, U.S. Department of Labor; PORTIA WU, Assistant Secretary, Employment and Training Administration, U.S. Department of Labor; and WILLIAM THOMPSON, Acting Administrator, Office of Foreign Labor Certification, U.S. Department of Labor, as follows:

## I. PREFATORY STATEMENT

1.      This is an action brought pursuant to Section 10b of the Administrative Procedure Act, 5 U.S.C. §702 and 28 U.S.C. §1331, seeking review of an April 13, 2016 decision by

Defendants, the U.S. Department of Labor's ("DOL") Office of Foreign Labor Certification ("OFLC"), denying the Plaintiff's Form ETA 9142A Application for Temporary Employment Certification ("H-2A Application"), which sought certification from the DOL that there are not sufficient U.S. workers able, willing and qualified to work for Plaintiff and that the employment of foreign nationals in such labor will not adversely affect the wages and working conditions of U.S. workers. 8 U.S.C. §1188. Defendants' decision is arbitrary, capricious, contrary to law and past agency practice, and unsupported by substantial evidence. Consequently, Plaintiff seeks an order reversing the agency denial.[1]

2.      The H-2A program allows for the temporary admission of foreign workers to the United States to perform agricultural labor or services of a seasonal or temporary nature, provided that U.S. workers are not available. In general, for purposes of the H-2A program, work is of a temporary nature where the employer's need for the worker will last no longer than one year.

3.      The DOL decision at issue concluded that Plaintiff and Maroa Farms ("Maroa"), a fellow subsidiary of Plaintiff's parent company, Mastronardi Produce ("Mastronardi"), constitute a single employer with a year-round need for employment, and consequently denied Plaintiff's H-2A Application. Exhibit ("Exh.") D (H-2A Denial dated April 13, 2016).   To reach the conclusion that Plaintiff and Maroa constitute a single employer with a year-round need for employment, DOL purported to apply the "single employer test," which requires the adjudicator to weigh the following four factors in order to determine whether two nominally separate companies are so intertwined that they should be considered a single employer: (1) common

---

[1] On March 30, 2016, Plaintiff filed a Complaint for Mandamus and Declaratory Judgment. *See* Pepperco v. Perez, No. 1:16-cv-328 (W.D. Mich. filed March 30, 2016). Two weeks later, on April 13, 2016, Defendants adjudicated Plaintiff's Form ETA 9142A Application for Temporary Employment Certification ("H-2A Application"), giving rise to this action.

ownership; (2) common management; (3) interrelated operations; and (4) centralized control of labor relations or personnel practices.

4.     The DOL decision is arbitrary, capricious, contrary to law and past agency practice, and unsupported by substantial evidence, because (1) Defendants deviated from settled agency practice by applying the "single employer test," a test that had virtually never been applied in the H-2A context and which the Plaintiff had no notice Defendant would apply; (2) application of the "single employer test" in the H-2A context is itself arbitrary and capricious because the test is unmoored from the purposes of the H-2A program and does not consider factors relevant to determining whether two employers are a single employer with a year-round need for employment – such as the possibility of workforce sharing and peak productivity timeframes; and (3), assuming the "single employer test" is a valid means by which Defendants may fulfill their statutory obligation, Defendants failed to properly apply the test here and disregarded relevant evidence. Put differently, because Defendants' decision is flawed as a matter of procedure, law, and evidence, it merits reversal by this Court.

5.     The agency's action has caused – and will continue to cause – irreparable harm to the Plaintiff. Plaintiff is a company that grows and sells peppers. The work is labor-intensive. Plaintiff lacks the workers it needs, despite its best efforts to locate and hire workers in the U.S. labor market. This labor shortfall renders Plaintiffs unable to grow and harvest peppers that the company can sell. When Plaintiff's plants are neglected – as is occurring now – they die, which eliminates the plant's production capacity. These problems continue to worsen with each passing day. Accordingly, along with this Complaint for Declaratory and Injunctive Relief, the Plaintiff seeks a preliminary injunction to compel Defendants to adhere to the statute and approve Plaintiff's clearly approvable H-2A Application.

3

6.     Plaintiff requests limited discovery to ascertain the agency's grounds for repeatedly denying the Plaintiff's H-2A applications. *See Voyageurs National Park Assoc. v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) (where an incomplete administrative record may "frustrate effective judicial review," the court may allow discovery to supplement the agency record"); *National Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (extra-record investigation may be appropriate where it is necessary to determine the reasons for the agency's choice"). As discussed in greater detail in Section V.D. – V.F., *infra*, Defendants first denied Plaintiff's H-2A Application for failure to file jointly with Maroa, a company Defendants allege is the same employer as Plaintiff. Exh. E (H-2A Denial dated Jan. 13, 2015).

7.     Plaintiff appealed and, following a de novo hearing before a DOL Administrative Law Judge, the Board of Alien Labor Certification Appeals ("BALCA") affirmed the denial. Exh. F (BALCA Decision dated February 23, 2015); *see also* Exh. G (Transcript of BALCA hearing conducted on February 6, 2015). Following the BALCA decision, Plaintiff filed a new H-2A Application jointly with Maroa perceiving this as the only way the agency would grant temporary labor certification for Plaintiff's needed workers. However, Defendant issued a Notice of Deficiency[2] requiring Plaintiff to withdraw from the jointly-filed application and file separately. Exh. H (Notice of Deficiency re: Maroa Farms dated July 17, 2015). Fearing that neither Plaintiff nor Maroa would receive labor certification and that both subsidiaries would be unable to employ foreign agricultural workers, Plaintiff withdrew from the jointly-filed H-2A Application.

---

[2] The DOL will issue a Notice of Deficiency ("NOD") where the Certifying Officer determines that an Application for Temporary Employment Certification is "incomplete, contains errors or inaccuracies, or do[es] not meet the requirements set forth" in the regulations. 20 C.F.R. §655.141(a).

8.     Plaintiff then filed – separately from Maroa – the H-2A Application that is the subject of this action. Again, Defendants denied Plaintiff's H-2A Application on the basis that Plantiff and Maroa are the same employer. Plaintiff requests limited discovery to understand the rationale and underlying causes of Defendants' baffling heads-I-win, tails-you-lose adjudicative history of Plaintiff's H-2A applications.

## II. JURISDICTION

9.     This is a civil action brought pursuant to 5 U.S.C. §701 *et seq.*, the Administrative Procedure Act ("APA"), and 28 U.S.C. §1331 (federal question jurisdiction), as well as 8 U.S.C. §1101 *et seq*, the Immigration and Nationality Act ("INA"). Original jurisdiction is vested in this Court by 28 U.S.C. §1346(a)(2) (civil actions against the United States), and 28 U.S.C. §2201 (declaratory relief), to redress the deprivation of rights, privileges, and immunities secured to the Plaintiff.

### A.     Subject Matter Jurisdiction

10.     Under the APA, "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702. The APA provides further that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. §704. The APA defines "agency action" to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). Agency action includes the denial of an H-2A Application for Temporary Employment Certification filed pursuant to 8 U.S.C. §1188(a) and 20 C.F.R. §§655.100 *et seq*. This action by the DOL is reviewable because it is inconsistent with the agency's own legal standards and settled practice. *See, e.g., Heckler v. Chaney,* 470 U.S. 821, 833 (1985)

(holding that administrative agencies are not "free to disregard legislative direction in the statutory scheme that the agency administers"); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."). The standards to be applied on review are governed by 5 U.S.C. §706. *Heckler,* 470 U.S. at 828.

11.    The APA does not independently provide a basis for subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 107 (1977). However, the Federal Question Statute, 28 U.S.C. §1331, confers jurisdiction over a suit that arises under a right of action created by the APA. *See Bowen v. Massachusetts,* 487 U.S. 879, 891 n.16 (1988) ("[I]t is common ground that if review is proper under the APA, the District Court ha[s] jurisdiction under 28 U.S.C. § 1331."). *See also Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Security,* 769 F.3d 1127, 1138 (D.C. Cir. 2014) ("This court has previously recognized that the general federal-question statute confers [federal court] jurisdiction over a similar challenge brought under the Immigration and Nationality Act.... [T]he district court had jurisdiction to hear Fogo de Chao's challenge.") *(citing Abourezk v. Reagan,* 785 F.2d 1043, 1050 (D.C. Cir. 1986)).

12.    Under the APA, federal courts review administrative actions to determine whether the agency acted arbitrarily or capriciously or abused its discretion. *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009) (citing 5 U.S.C. §706(2)(A)). The requirement that agency action not be arbitrary and capricious includes an obligation that the agency "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983). Moreover, the agency must take appropriate steps to explain its actions in a manner "that will enable the

court to evaluate the agency's rationale" at the time of its decision. *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 654 (1990).

13.     Two well-established canons of statutory construction also support the Court's assertion of subject matter jurisdiction. *See Kucana v. Holder,* 558 U.S. 233, 251 (2010) (noting that "executive determinations generally are subject to judicial review"). First, congressional intent to limit a court's jurisdiction must be "clear and convincing" in order to preclude judicial review. *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 63-64 (1993); *Bd. of Governors of the Fed. Reserve Sys. v. M Corp. Fin., Inc.,* 502 U.S. 32, 44 (1991). Second, there is a "strong presumption" in favor of judicial review of administrative acts. *INS v. St. Cyr,* 533 U.S. 289, 298 (2001); *Kucana,* 558 U.S. at 241. These principles support the Court's assertion of subject matter jurisdiction to review the Plaintiff's claims.

14.     Section 242 of the INA, 8 U.S.C. §1252, does not deprive this Court of jurisdiction. 8 U.S.C. §1252(a)(5) provides that "a petition for review filed with an appropriate court of appeals in accordance with this section, shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act[.]" As the present action is not an action to review a removal order but an action challenging a decision by the Defendant DOL to deny an application for temporary employment certification, which denial was arbitrary, capricious, and contrary to law and settled practice, this Court retains original jurisdiction under the APA and 28 U.S.C. §1331, as well as for declaratory relief under 28 U.S.C. §2201.

15.     8 U.S.C. §1252(a)(2)(B) provides that no court shall have jurisdiction to review either (i) "any judgment regarding the granting of" various forms of relief from removal, or (ii) "any other decision or action of the Attorney General or the Secretary of Homeland Security the

authority for which is specified ... to be in the discretion of the Attorney General or the Secretary of Homeland Security[.]" Because denial of a temporary employment certification application is neither a judgment regarding the granting of relief from removal nor a decision or action that is specified to be in the discretion of the Attorney General or the Secretary of Homeland Security, the Court retains original jurisdiction over this claim. *See* 8 U.S.C. §1188; *see also Kucana,* 558 U.S. at 244-251.

16.     Furthermore, 8 U.S.C. §1252(a)(2)(B)(ii) does not divest the Court of jurisdiction to review DOL's denial of Plaintiff's H-2A Application. As the Supreme Court has explained, in enacting 8 U.S.C. §1252(a)(2)(B)(ii) "Congress had in mind ... those [agency decisions] made discretionary by legislation." *Kucana,* 558 U.S. at 246-47. Consequently, the jurisdiction-stripping provision applies only to the "narrower category of decisions where Congress has taken the additional step to *specify* that the sole authority for the action is in the Attorney General's discretion." *Alaka v. Att'y Gen. of U.S.,* 456 F.3d 88, 95 (3d Cir. 2006) (emphasis added). Absent "clear and convincing evidence" of congressional intent specifically to eliminate review of certain administrative actions, the above-cited principles of statutory construction support a narrow reading of the jurisdiction-stripping language at 8 U.S.C. §1252(a)(2)(B)(ii). *Kucana,* 558 U.S. at 252; *see also Obioha v. Gonzales,* 431 F.3d 400, 405 (4th Cir. 2005) (holding that 8 U.S.C. §1252(a)(2)(B)(ii) should be interpreted narrowly where the narrower interpretation is as likely as the broader interpretation).

17.     The statutory provision authorizing DOL to grant or deny temporary employment certification applications nowhere specifies that the agency's decision is "in the discretion" of the Secretary of Labor. *Compare, e.g.,* 8 U.S.C. §1188 *with* 8 U.S.C. §1255(a) ("The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the

Attorney General, *in his discretion* ... to that of an alien lawfully admitted for permanent residence[.]") (emphasis added). Had Congress intended to strip the courts of authority to review inherently — as opposed to specifically — discretionary decisions by the agency regarding immigration matters, it could have clearly indicated its intent. *See Kucana,* 558 U.S. at 248; *McNary v. Haitian Refugee Center,* 498 U.S. 479, 494 (1991).

18.     Here, unlike in the adjustment of status context, Congress did not do so. Without such a clear statement of intent, the Court should not find that Congress meant to divest the federal judiciary of such fundamental power. In addition, DOL has promulgated regulations and practices — discussed in Section VI.A., *infra,* — that guide its adjudication of temporary employment certification applications, and which provide the Court the necessary standard for judicial review of the agency's action under the APA. *See, e.g., M.B. v. Quarantillo,* 301 F.3d 109, 113 (3d Cir. 2002) (finding that regulations governing adjudication of certain visa petitions, coupled with agency field guidance, provided sufficient guidance for judicial review of agency action).

## B.     Standing

19.     Because Plaintiff has suffered an injury in fact — the erroneous denial of its temporary employment certification application and consequent inability to employ a workforce willing and able to tend to pepper growing at its greenhouse facilities, which threatens permanent and ongoing harm to Plaintiff's business and industry reputation —Plaintiff has standing to complain. *See*, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that standing requires a plaintiff to show (1) an injury-in-fact, (2) a causal connection between the injury and the complained-of conduct, and (3) a likelihood that the injury will be redressed by a favorable decision). Plaintiff has standing as it has "'alleged such a personal stake in the outcome

of the controversy' as to warrant [its] invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A favorable decision by this Court — reversing the agency's temporary employment certification denial as arbitrary, capricious, contrary to law, and not supported by substantial evidence — would grant Plaintiff the relief that it seeks. *See Wilderness Society v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006) ("The redressability inquiry poses a simple question: If plaintiff[] secured the relief [he] sought ... would it redress [his] injury?").

## C.    Finality, Ripeness, and Exhaustion

20.    The April 13, 2016 decision of the DOL Certifying Officer constitutes "final agency action" for purposes of APA review. *See* 5 U.S.C. §704. The decision "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997).

21.    Determining ripeness of administrative action for judicial review demands an evaluation of (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003). Plaintiff's claims are fit for judicial decision because the dispute presents legal questions and there is a "concrete dispute" between the parties. *Id.* at 812. Furthermore, the Plaintiff will continue to suffer significant hardship if no court reviews the agency denial.

22.    The erroneous denial by DOL of Plaintiff's H-2A Application, and Plaintiff's consequent inability to employ the workforce it needs to grow and harvest peppers, is highly likely to result in a substantial loss of earnings and threatens permanent and ongoing harm to

the Plaintiff's business and industry reputation. *See* Motion for Preliminary Injunction. There is "no other adequate remedy in a court" for the Plaintiff's claims. 5 U.S.C. §704. And the mere opportunity to submit a new H-2A Application, and obtain a decision on that petition, would not relieve the hardship caused by this Court withholding consideration of the Plaintiff's claims that the agency's denial was erroneous and should be reversed. *See Sharkey v. Quarantillo,* 541 F.3d 75, 90 (2d Cir. 2008).

23.     Exhaustion of available administrative remedies is not required. Courts cannot require a Plaintiff pursuing an APA challenge to exhaust administrative remedies where, as here, exhaustion is not expressly required by statute or agency rule. *Darby v. Cisneros*, 509 U.S. 137, 153 (1993). The regulation governing administrative appeals of H-2A applications is 20 C.F.R. §655.171, which provides that "employers *may* request an administrative review or de novo hearing before an ALJ of a decision by the [Certifying Officer]." 20 C.F.R. § 655.171 (emphasis added). The regulation plainly permits — but does not require — the employer to file an administrative appeal. For a regulation to mandate exhaustion, the regulatory language must be explicit. *See, e.g., Shawnee Trail Conservancy v. USDA*, 222 F.3d 383 (7th Cir. 2000) (exhaustion mandatory where regulation states that federal district court review would be premature unless plaintiff exhausted administrative remedies); *United States v. Menendez*, 48 F.3d 1401, 1412 n.15 (5th Cir. 1995) (identifying statutes that may impose a mandatory exhaustion requirement.).[3]

---

[3] Even if there were a plausible argument that exhaustion is required under the H-2A statutory and regulatory scheme, settled law provides for waiver of exhaustion requirements where the delay for administrative action would cause the plaintiff irreparable injury. *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591-92 (1926) (claimant "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"); *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (disability benefit claimants "would be irreparably

### III. <u>VENUE</u>

24.     Venue is proper in this district under 28 U.S.C. §1391(e), because this is an action brought in the district where the Plaintiff resides and no real property is involved in the action.

### IV. <u>PARTIES</u>

25.     Plaintiff, PEPPERCO-USA, INC. ("Pepperco"), is a Michigan corporation that grows and sells peppers. Pepperco is a located in the Township of Coldwater, Michigan. Pepperco was established in 2014.

26.     The Defendant THOMAS E. PEREZ is Secretary of the U.S. Department of Labor. This suit is brought against Secretary Perez in his official capacity, as he is charged with overseeing the adjudication of H-2A applications for temporary employment certification.

27.     The Defendant PORTIA WU is Assistant Secretary of the Employment and Training Administration within the U.S. Department of Labor. This suit is brought against Assistant Secretary Wu in her official capacity.

28.     The Defendant WILLIAM THOMPSON is Acting Administrator, Office of Foreign Labor Certification within the U.S. Department of Labor. This suit is brought against Acting Administrator Thompson in his official capacity.

### V. <u>FACTS AND PROCEDURAL HISTORY</u>

**A.      Overview of H-2A Seasonal Agricultural Worker Program Application Process**

29.     The H-2A temporary agricultural program, a creature of 8 U.S.C. §1101(a)(15)(H)(ii)(a), allows agricultural employers who anticipate a shortage of domestic workers to bring nonimmigrant foreign workers to the United States to perform agricultural labor or services of a temporary or seasonal nature. Employment is of a seasonal nature where it is tied

---

injured were the exhaustion requirement now enforced against them"). Likewise here, for reasons explained in the Plaintiff's accompanying Motion for Preliminary Injunction.

to a certain time of year by an event or pattern, such as a short annual growing cycle, and requires labor levels above what is necessary for ongoing operations. 20 C.F.R. §655.103(d). Employment is of a temporary nature when the employer's need to fill the position with a temporary worker will, except in extraordinary circumstances, last no longer than 1 year. *Id.*

30.     H-2A petitions cannot be approved unless the petitioner has applied to DOL for certification that there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed. 8 U.S.C. §1188(a)(1). The procedures by which DOL acquires information sufficient to make these certifications are set forth at 20 C.F.R. §§655.100 – 655.235.

31.     Following compliance with certain pre-filing procedures set forth at 20 C.F.R. §§655.120-655.122, an agricultural employer who seeks to hire H-2A foreign agricultural workers must apply for certification under 8 U.S.C. §1188(a)(1) from the U.S. Secretary of Labor by filing Form ETA 9142A, Application for Temporary Employment Certification. 20 C.F.R. §655.130. The form requires the employer to disclose the nature and duration of the needed employment, its efforts to recruit U.S. workers, as well as information about the employer, the job offer, and the salary. *See* Form ETA 9142A, *available at* https://www.foreignlaborcert.doleta.gov/pdf/ETA_Form_9142A.pdf (last visited Apr. 20, 2016).

32.     The proper filing of an Application for Temporary Employment Certification triggers a mandatory duty on the part of an OFLC Certifying Official ("CO") to review the application for compliance. 20 C.F.R. §655.140. If the CO determines the application is compliant, he or she will issue a Notice of Acceptance, see 20 C.F.R. §655.143, and if post-

acceptance requirements are met, the official will either grant or deny the application. 20 C.F.R. §655.160. If, on the other hand, the CO determines that the application is "incomplete, contains errors or inaccuracies, or do[es] not meet the requirements set forth" in the regulations, he or she will issue a NOD identifying the reasons why the CO believes the application fails to meet the criteria for acceptance and offering the employer a limited amount of time to respond. 20 C.F.R. §655.141.

33.    If the DOL approves Form ETA 9142A, the employer may then file Form I-129 Petition for a Nonimmigrant Worker with U.S. Citizenship and Immigration Services ("USCIS"), to petition for alien beneficiaries to come temporarily to the United States as nonimmigrant workers to perform services or labor.

34.    After USCIS approves Form I-129, prospective H-2A workers who are outside the United States must either apply for an H-2A visa with the U.S. Department of State at a U.S. Embassy or Consulate abroad and then seek admission to the United States from U.S. Customs and Border Protection ("CBP") at a U.S. port of entry, or they may directly seek admission at a U.S. port of entry.

**B.    Plaintiff's Corporate Structure and Relationship to Mastronardi and Maroa**

35.    Plaintiff Pepperco-USA is a Michigan corporation that formed in 2014 for the purpose of growing peppers. It owns real estate in the township of Coldwater, Michigan. Plaintiff has constructed three hydroponic greenhouses spanning roughly 41 acres.

36.    Plaintiff is a wholly-owned subsidiary of Mastronardi Produce-USA. Mastronardi's primary operation is the distribution of fresh produce throughout the United States. Mastronardi's main headquarters are in Livonia, Michigan, and it has a small facility in Lakeland, Florida. Mastronardi has affiliated operations in Canada and conducts business

14

worldwide, including Mexico, Australia, New Zealand, and throughout the European Union. Mastronardi's produce sales generates roughly $1 billion in annual global sales. Mastronardi is a large-scale business and employer in the agricultural industry.

37.     Mastronardi is the parent corporation of a number of subsidiaries, including Brushco Farms, Inc. (a Colorado corporation), Mastronardi Intellectual Properties (a Michigan corporation), Maroa Farms, Inc. (an Illinois corporation), and others. Maroa owns approximately 50 acres of commercial hydroponic greenhouses in the city of Coldwater, Michigan. Maroa grows solely tomatoes.

38.     Plaintiff and Maroa, despite their common ownership by Mastronardi, are and operate as separate companies. Day-to-day operations at each company are handled by their respective management teams – Plaintiff and Maroa each have their own human resources teams, general managers, head growers, head labor supervisors, and assistant growers. Plaintiff and Maroa operate separately as far as hiring and firing, payroll, work scheduling, accounting, and safety training. The two companies have different bank accounts, separate Federal Employer Identification Numbers, and insurance policies. Plaintiff conducts separate Board meetings from Maroa. Plaintiff supplies, purchases, maintains, and provides the tools and supplies for its workforce and management team independently of Maroa.

**C.     Plaintiff's Distinct Season, Need, and Inability to Share Workers with Maroa**

39.     Due to the growing conditions for peppers, and the amount of available sunlight at different times of the year in Michigan, Plaintiff's growing season runs from February through November of each year.  Peppers are not grown during the low-sunlight months of December and January. The growing season for peppers cannot be manipulated through the use of artificial light, as peppers do not respond well to such techniques.  Instead, growers like Plaintiff use the

darkest months of the year to sanitize and decontaminate pepper greenhouses rather than growing peppers during that time.

40. Maroa maintains its own separate growing season for growing tomatoes. Maroa plants its tomatoes in August and finishes its season in June.

41. Plaintiff and Maroa *require* their own distinct workforces. Beyond the difference in their organizational operations, there are horticultural reasons why pepper farmworkers and tomato farmworkers are not interchangeable in the agricultural industry. To prevent cross-contamination, seasonal workers at Maroa's facility cannot and do not work at the Plaintiff's facility, and vice versa. This basic sanitary measure is commonplace in hydroponic greenhouses to keep crops free of disease and pathogens – and it is particularly vital where the crops being cultivated are tomatoes and peppers, as those crops can transmit common diseases to one another through use of the same work crew.

42. The second reason for maintaining separate crews of farm labor involves the skill-set and time and energy spent to train farmworkers to harvest a particular crop. It is not practical to have farm labor rotate between two different crops and facilities. Each crop has its own skill-set. For example, a tomato farmworker needs to learn how to grow, manipulate, and handle the tomato crop. The same is true for peppers. It takes a great deal of time, training, and ongoing supervision throughout the growing season.

**D.     Plaintiff's First H-2A Application**

43. Plaintiff first filed for temporary employment certification from the Defendants in December 2014. On January 13, 2015, Defendants issued a decision denying Plaintiff's application on the grounds that Plaintiff had failed to establish that Plaintiff had a seasonal or temporary need for workers. Exh. E (H-2A Denial dated Jan. 13, 2015). According to the denial,

16

Plaintiff's application could not be considered in isolation, but must be considered in conjunction with Maroa's previously filed application to obtain workers for its tomato-growing operations. Defendants asserted that "the interlocking nature of [Plaintiff and Maroa] renders the fact of separate corporate forms inconsequential." *Id*. In support of the conclusion that Plaintiff and Maroa are "interlocking" entities, Defendants discussed the following factors: (i) the job duties and minimum qualifications described in the entities' respective H-2A applications; (ii)  shared senior management; (iii) the point of contact provided on the H-2A Application; and (iv) the proximity of the entities' greenhouses. *Id*.

44.     Plaintiff appealed. On February 6, 2015, an ALJ within the DOL conducted a de novo hearing pursuant to 20 C.F.R. §655.171(b). Exh. G (Transcript of BALCA hearing conducted on February 6, 2015).

45.     On February 23, 2015, the ALJ issued a decision and order affirming the CO's denial of Plaintiff's H-2A Application. Exh. F (BALCA Decision dated February 23, 2015). According to the ALJ, the case turned on whether Plaintiff's and Maroa's operations "are so interconnected that they can be considered a single entity." Exh. F. The ALJ proceeded to discuss several recent BALCA decisions involving applicants for temporary employment certification alleged to have had an "interlocking" relationship with another employer who had previously filed an H-2A application. Exh. F, at 26-30. The cases cited by the ALJ discussing what may best be referred to as the "interlocking relationship test," reflected an ad hoc, fact-intensive analysis that deemed the following questions relevant, but did not assign special weight to any single factor:

- whether the two employers share a workspace;

- whether the H-2A job duties were similar or would be shared between the H-2A workers;

- whether the employers have distinct payroll records;

- whether the employers maintain separate FEIN numbers;

- whether the employers receive separate farm subsidies;

- whether the employers share employees generally;

- whether control is exercised by a single individual;

- whether the employers listed the same point of contact on their H-2A applications; and

- whether the employers sought to certify the same number of workers.[4]

46.     The ALJ acknowledged that Plaintiff and Maroa are "legally separate entities, with separate FEINs, financing, accounting, banking, contracting and the like." Exh. F, at 30. He further acknowledged that when then-newly founded Plaintiff commences operating, it and Maroa will "have separate management teams, including separate general managers, human resources teams, head growers, and lead growers." *Id*. Moreover, the ALJ recognized that the two companies "grow different crops, with different requirements necessitating different skills from the fully-trained workers. They operate separate greenhouses with separate utilities." *Id*. Finally, the ALJ appreciated that "[t]hose who work at Maroa Farms cannot work at Pepperco, both because of the need to prevent the spread of plant disease/contamination, and because it would be illegal to share employees under separate temporary labor certifications." *Id*.

---

[4] Exh. F, at 26-30 (discussing *The Fingerling Company*, ALJ No. 2013-TLC-017 (Jan. 18, 2013); *Anthony Mock*, ALJ No. 2015-TLC-008 (Dec. 30, 2014); *JSF Enterprises*, ALJ No. 2015-TLC-009 (Jan. 22, 2015); *Larry Ulmer*, ALJ No. 2015-TLC-003 (Nov. 4, 2014); *Cressler Ranch Trucking, LLC*, ALJ No. 2013-TLC-007 (Nov. 26, 2012); *Altendorf Transport, Inc.*, ALJ No. 2013-TLC-026 (Mar. 28, 2013); *Katie Heger*, ALJ No. 2014-TLC-001 (Nov. 12, 2013)). Other BALCA decisions applying the "interlocking relationship test" considered whether the H-2A workers would be housed in the same location, *Fegley Grain Cleaning*, ALJ No. 2015-TLC-00067 (Oct. 5, 2015); whether the employers grew the same crops, *Legume Matrix, LLC*, ALJ No. 2016-TLC-008 (Dec. 8, 2015); and whether the employers offered the same rate of pay. *Id*.

47.     Nevertheless, the ALJ ruled that Plaintiff and Maroa were "interlocking" entities because they are both wholly-owned subsidiaries of Mastronardi, whose president, treasurer, chief operating officer, director of greenhouse operations, and registered agent also have those titles within Plaintiff and Maroa's organizations. Exh. F at 30. The ALJ pointed to the fact that some Mastronardi staff work at the subsidiaries' facilities and that certain legally binding documents filed with Plaintiff and Maroa's respective applications were signed by the same individual on behalf of the two entities. *Id*. The ALJ also asserted that "control" over both Plaintiff and Maroa is exercised by Mastronardi. *Id*. at 31. Finally, the ALJ noted that "all company witnesses called by Pepperco in support of its application identified themselves as employees of Mastronardi."[5] *Id*.

**E.     Plaintiff's Second H-2A Application (Joint Application with Maroa)**

48.     Following Defendants' adverse decision on Plaintiff's first H-2A Application, Plaintiff, in need of workers, attempted to change course and apply for H-2A workers together with its fellow subsidiary, Maroa. In July 2015, *only because Defendants previously concluded that Plaintiff and Maroa should be considered a "single entity" for H-2A purposes*, Exh. F at 26-31, Plaintiff and Maroa jointly filed an H-2A Application.

49.     On July 17, 2015, Defendants issued a NOD. Exh. H (Notice of Deficiency re: Maroa Farms dated July 17, 2015). The NOD stated that it "is inappropriate for Pepperco and Maroa Farms to file as joint employers." *Id*. The NOD further provided that the employer "must either modify the application such that it no longer reflects a filing as a joint employer or provide

---

[5] The ALJ did not explain why he assigned weight to certain factors over others, nor did he explain how his decision was impacted by the fact that the respective employers do not and cannot utilize the same workforce.

evidence that [Plaintiff] and Maroa Farms should now be viewed as separate filers for purposes of the H-2A program." *Id*.

50.    Out of concern that neither entity would receive temporary employment certification for the 2015 season, Plaintiff withdrew from the jointly-filed H-2A Application. Defendants subsequently approved the Maroa H-2A Application.

**F.    Plaintiff's Third H-2A Application**

51.    On December 11, 2015, Plaintiff filed a new H-2A Application – the application at the center of this cause of action. Exh. A (H-2A Application filed on December 11, 2015). The application sought farmworkers to fill a need from February 1, 2016 to November 30, 2016, the standard production season for the Plaintiff. *Id*. The application included a letter from the Michigan Department of Agriculture and Rural Development, confirming the deficit of labor to meet the company's production needs. *Id*. Also included with the application were photographs demonstrating the devastation wrought to Plaintiff's crops the previous year due to its inability to employ H-2A workers. *Id*. In addition, the H-2A Application contained a letter from Dr. Sanaullah Sardar, professional greenhouse crop consultant, outlining the impossibility of "sharing" labor between operations growing peppers and operations growing tomatoes. *Id*.

52.    On February 2, 2016, Defendants issued a NOD. Exh. B (Notice of Deficiency dated February 2, 2016). The NOD required Plaintiff to provide certain information relating to the relationship between Plaintiff, Mastronardi, and Maroa, including information related to the companies' management structure, hiring and firing authority, human resources operations, and recruitment of employees, among other issues. *Id*.

53.     On February 9, 2016, Plaintiff filed a comprehensive response to the NOD, addressing all issues raised by Defendants in the NOD. Exh. C (Response to Notice of Deficiency dated February 9, 2016).

54.     On April 13, 2016, following Plaintiff's initiation of a mandamus lawsuit, Defendants denied Plaintiff's H-2A Application. Exh. D (H-2A Denial dated April 13, 2016). The decision provides,

> In order to assess whether two nominally separate entities are a single employer for the purposes of assessing whether the need is temporary or permanent, [Defendants] appl[y] the single employer test. The single employer test is widely used in labor and employment law, as well as in the temporary foreign labor context, and seeks to determine whether two or more nominally separate companies are sufficiently intertwined that they should be considered a single employer. Thus, the following four factors are assessed, and form the basis of an analytical framework to assist in making such a determination: (1) common ownership, (2) common management, (3) interrelated operations, and (4) centralized control of labor relations or personnel practices."

Exh. D at 5 (internal footnotes and citations omitted).

55.     Purporting to apply the "single employer test," Defendants concluded that Plaintiff and Maroa "are a single employer[.]" *Id*.

56.     Following Defendants' April 13, 2016 decision, Plaintiff filed this action.

## VI. <u>CAUSE OF ACTION</u>

57.     Plaintiff incorporates by reference the allegations of paragraphs 1 - 56 of the Complaint as if fully set forth herein.

58.     Plaintiff alleges three grounds for relief. First, Defendants' decision to suddenly apply the "single employer test" – a test virtually unknown in the H-2A context – without notice to Plaintiff, rather than the "interlocking relationship test," was arbitrary and capricious. Second, the "single employer test" itself, which emerged to serve radically different needs than those present in the H-2A program, and which does not even consider whether the two entities can

share a workforce or whether the entities' labor needs ebb and flow during the year, makes scant sense in the temporary foreign labor certification context and thus fails arbitrary and capricious review. Third, assuming *arguendo* that the "single employer test" is a permissible means for Defendants to implement the temporary employment certification process set forth at 8 U.S.C. §1188, the manner in which Defendants applied that test fails substantial evidence review because Defendants have ignored relevant evidence in the record.

## A.      Standards for H-2A Applications

59.      Two statutory provisions govern the H-2A program: 8 U.S.C. §1101(a)(15)(H)(ii)(a), which sets forth the parameters of the H-2A visa category, and 8 U.S.C. §1188, which governs the temporary employment certification process and other aspects of the admission of temporary H-2A workers.

60.      8 U.S.C. §1101(a)(15)(H)(ii)(a) defines H-2A workers as foreign nationals "coming temporarily to the United States to perform agricultural labor or services ... of a temporary or seasonal nature."

61.      8 U.S.C. §1188(a)(1) provides that H-2A visa petitions may not be approved unless the employer applies to the "Secretary of Labor for a certification that—

**(A)**      there are not sufficient workers who are able, willing and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

**(B)**      the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."

62.      The Department of Labor has promulgated regulations governing the temporary employment certification process. 20 C.F.R. §§655.100 *et seq*. Critical regulations for purposes of this action include 20 C.F.R. §655.103(a) ("Overview"); §655.103(b) (definitions of

"employee" and "employer"); and §655.103(d) (definition of a "temporary or seasonal nature").

63.    According to 20 C.F.R. §655.103(a) ("Overview"), "[i]n order to bring nonimmigrant workers to the U.S. to perform agricultural work, an employer must first demonstrate to the Secretary that there are not sufficient U.S. workers able, willing, and qualified to perform the work in the area of intended employment at the time needed and that the employment of foreign workers will not adversely affect the wages and working conditions of U.S. workers similarly employed."

64.    20 C.F.R. §655.103(b) defines "employee" as "[a] person who is engaged to perform work for an employer, as defined under the general common law of agency. Some of the factors relevant to the determination of employee status include: The hiring party's right to control the manner and means by which the work is accomplished; the skill required to perform the work; the source of the instrumentalities and tools for accomplishing the work; the location of the work; the hiring party's discretion over when and how long to work; and whether the work is part of the regular business of the hiring party. Other applicable factors may be considered and no one factor is dispositive."

65.    20 C.F.R. §655.103(b) defines "employer" as "[a] person (including any individual, partnership, association, corporation, cooperative, firm, joint stock company, trust, or other organization with legal rights and duties) that:

(1) Has a place of business (physical location) in the U.S. and a means by which it may be contacted for employment;

(2) Has an employer relationship (such as the ability to hire, pay, fire, supervise or otherwise control the work of employee) with respect to an H-2A worker or a worker in corresponding employment; and

  **(3)** Possesses, for purposes of filing an *Application for Temporary Employment Certification,* a valid Federal Employer Identification Number (FEIN).

66.   20 C.F.R. §655.103(d) provides that for purposes of the H-2A program, "employment is of a seasonal nature where it is tied to a certain time of year by an event or pattern, such as a short annual growing cycle or a specific aspect of a longer cycle, and requires labor levels far above those necessary for ongoing operations. Employment is of a temporary nature where the employer's need to fill the position with a temporary worker will, except in extraordinary circumstances, last no longer than 1 year."

67.   When assessing whether proposed H-2A employment is of a "temporary or seasonal nature" – as it must be under 8 U.S.C. §1101(a)(15)(H)(ii)(a) – the DOL follows *Matter of Artee Corporation*, 18 I&N Dec. 366 (Comm'r 1983). In *Artee*, the Commissioner for the Immigration and Naturalization Service ("INS")[6] held that the test for determining whether a foreign national is coming "temporarily" to the United States to perform temporary services or labor is whether the *need of the employer* for the duties to be performed is temporary. *Id*. at 367. *Artee* reversed a long-standing INS rule according to which the functional nature of the duties of the job controlled its characterization. *Matter of Contopoulos*, 10 I&N Dec. 654 (R.C. 1964). *Artee* clarified, "[i]t is not the nature of the duties of the position which must be examined to determine the temporary need. It is the nature of the need for the duties to be performed which determines the temporariness of the position." *Artee*, 18 I&N Dec. at 367. Though *Artee* construed a precursor statute to 8 U.S.C. §1101(a)(15)(H)(ii)(a), DOL applies *Artee* to H-2A cases. *Curl Farm*, ALJ No. 2013-TLC-004, slip op. at 7 (Nov. 7, 2012); 52 Fed. Reg. 20,496

---

[6] Pursuant to the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135 (2002), the Immigration and Naturalization Service has ceased to exist, and its enforcement functions have been transferred to the Department of Homeland Security.

(1987) (interim final rule, June 1, 1987) (adopting *Artee* for contemporary H-2A program); *see also Sweet Life v. Dole*, 876 F.2d 402, 404 n.4 (5th Cir. 1989).

68.     To determine whether an employer's need for labor is seasonal, it is necessary to establish when the employer's season occurs and how the need for labor or services during this time of the year differs from other times of the year. *Altendorf Transport*, 2011-TLC-158, slip op. at 11 (Feb. 15, 2011).

**B.     Defendants' Decision to Depart from Precedent and Suddenly Apply the "Single Employer Test" Was Arbitrary and Capricious**

69.     Defendants denied Plaintiff's H-2A Application because, according to the Defendants, under the "single employer test" Plaintiff and Maroa are a "single employer." Exh. D.  For the reasons that follow, Defendants' decision to apply the "single employer test" to the adjudication of Plaintiff's H-2A Application was arbitrary and capricious.

70.     The first opinion from BALCA evaluating whether two employers were so "interlocking" that they should be considered a single employer with a year-round need was issued in March 2013. *See Altendorf Transport*, ALJ No. 2013-TLC-00026 (Mar. 28, 2013).  For approximately the next three years, Defendants regularly applied the "interlocking relationship test" to cases – including in Plaintiff's previous BALCA appeal – involving two employers whom Defendants believed to be a single employer for H-2A purposes. *See* n. 4 *supra* (collecting cases).

71.     On April 6, 2016, after Plaintiff had filed its H-2A Application and responded to Defendants' NOD, BALCA applied, for the first time in the H-2A context, a different test – the "single employer test" derived from case law arising under the National Labor Relations Act – to assess whether two employers should be considered one for H-2A purposes. *See Sugar Loaf*

*Cattle Co*., ALJ No. 2016-TLC-00033 (April 6, 2016).  One week later, Defendants invoked this novel test in their denial of Plaintiff's H-2A Application.

72.      When Plaintiff filed its H-2A Application in December 2015 and responded to the NOD in February 2016, it had no notice that Defendants would apply this test – a virtual stranger in the H-2A context – in adjudicating Plaintiff's H-2A Application.

73.      Although there is overlap between the "single employer test" and the "interlocking relationship test," there also are significant differences. The "single employer test" considers four factors to determine whether two nominally separate companies are so intertwined that they should be considered a single employer: (1) common ownership; (2) common management; (3) interrelated operations; and (4) centralized control of labor relations or personnel practices. By contrast, the "interlocking relationship test" – which appears to have been created specifically for the H-2A program – considers (or, purports to consider) certain additional factors uniquely relevant to the H-2A program, including whether the H-2A job duties are similar or will be shared between H-2A workers, *Larry Ulmer*, ALJ No. 2015-TLC-003 (Nov. 4, 2014); whether the employer is attempting to circumvent the temporary employment requirement, *id*.; whether the employers maintain separate FEIN numbers, *Fegley Grain Cleaning*, ALJ No. 2015-TLC-00067 (Oct. 5, 2015); whether the employers grow the same crops, *Legume Matrix, LLC*, ALJ No. 2016-TLC-008 (Dec. 8, 2015); and whether the employers list the same point of contact on their H-2A applications, *Fegley Grain Cleaning*, ALJ No. 2015-TLC-00067 (Oct. 5, 2015). Some of these factors are directly tied to Defendants' own regulatory definition of "employer." 20 C.F.R. §655.103(b).[7]

---

[7] To be clear, Plaintiff does not mean to endorse the "interlocking relationship test" as applied by Defendants. Defendants' decisions applying the test have been all over the map, with different factors winning the day and certain seemingly relevant evidence receiving no consideration.

74.    Defendants did not even acknowledge that the test they chose to apply in adjudicating Plaintiff's H-2A Application represented a departure from established practice. In fact, the opposite is true – Defendants asserted, rather astonishingly, that the "single employer test is widely used … in the temporary foreign labor context …." Exh. D, at 5.   The only authority cited for that proposition from the H-2A context is *Sugar Loaf Cattle*, ALJ No. 2016-TLC-00033 (Apr. 6, 2016), which Defendants handed down only a week prior to denying Plaintiff's application. *Sugar Loaf Cattle*, like the CO's decision at issue in this case, also failed to acknowledge that the "single employer test" amounted to a departure from prior decisionmaking. *Sugar Loaf Cattle*, ALJ No. 2016-TLC-00033 slip op. at 6 (April 6, 2016).

75.    When an agency changes course without offering a thorough analysis or explanation for the change, its resulting decision may be found arbitrary and capricious and subject to reversal under the APA. *Lone Mountain Processing v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013); *Ramaprakash v. Fed. Aviation Admin.*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003). Of course, agencies may be permitted to alter past rulings and practices, but such a

*Compare Anthony Mock*, ALJ No. 2015-TLC-008 (Dec. 30, 2014) (not "interlocking relationship" where employer maintained separate payrolls, FEINs, farm subsidies and did not share ownership, employees, or assets) *with Pepperco-USA, Inc.*, ALJ No. 2015-TLC-00015 (Feb. 23, 2015) ("interlocking relationship" found even though two businesses are legally distinct entities with separate payrolls, FEINs, management teams, and an inability to share workers); *see also JSF Enterprises*, ALJ No. 2015-TLC-009 (Jan. 22, 2015) (omitting analysis of employer's argument that entity not formed to circumvent H-2A requirements); *Larry Ulmer*, ALJ No. 2015-TLC-003 slip op. at 4 (Nov. 4, 2014) (holding that "it would be reasonable to infer that [the two employers] function as one and are attempting to circumvent the temporary employment requirement"). However, the "interlocking relationship test" did at least purport to consider some of the factors relevant to H-2A adjudications and the H-2A regulatory definition of "employer," including the following: whether the H-2A job duties are similar or would be shared between the H-2A workers; whether the employers maintain separate FEIN numbers; and whether the employers have listed the same point of contact on their H-2A applications. If applied evenhandedly, the "interlocking relationship test" may well be an appropriate method by which the agency can distinguish between "alter-ego" corporations seeking to circumvent the H-2A requirements and those organizations that simply have a common parent but otherwise operate completely independently.

departure requires the agency to "display awareness that it *is* changing position" and not to "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Reasoned decision-making obligates the agency to acknowledge and provide an adequate explanation for its departure from established precedent. *Id.* ("The agency must show that there are good reasons for the new policy.").

76.     Because Defendants offered no explanation or justification for their abrupt change in position, and because they provided no notice to Plaintiff that the "single employer test" would be applied to Plaintiff's H-2A Application, Defendants' decision is arbitrary and capricious.

**C.     The "Single Employer Test" Itself Is Arbitrary and Capricious In the Temporary Labor Certification Context**

77.     Application of the "single employer test" in the H-2A context itself fails arbitrary and capricious review, because it is untethered to the purposes of the H-2A program. The "single employer test" emerged from a different body of law to serve drastically different needs, and it fails to take into account the H-2A regulatory definition of "employer."

78.     "The single employer doctrine is a [National Labor Relations] Board creation that treats two or more related enterprises as a single employer for purposes of holding the enterprises jointly to a single bargaining obligation or for the purpose of considering liability for any unfair labor practices." *Iowa Exp. Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir. 1984). The single employer doctrine relates to the definition of "employer within the meaning of section 2(2) of the [National Labor Relations Act, or NLRA], 29 U.S.C. § 152(2)." *Carpenters Local U. No. 1846 v. Pratt-Farnsworth*, 690 F. 2d. 489, 504 (5th Cir. 1982). As the CO correctly stated in his April 13, 2016 decision, the single employer test has migrated to several other contexts,

including cases under the Employee Retirement Income Security Act ("ERISA"), the Age Discrimination in Employment Act ("ADEA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), among others. Exh. D, at 5 n.2.

79.     Notably, however, the NLRA and the H-2A regulations define the term "employer" differently. Under the NLRA, "employer" includes "any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C. 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." By way of comparison, an employer for H-2A purposes is "[a] person (including any individual, partnership, association, corporation, cooperative, firm, joint stock company, trust, or other organization with legal rights and duties) that:

    **(1)**    Has a place of business (physical location) in the U.S. and a means by which it may be contacted for employment;

    **(2)**    Has an employer relationship (such as the ability to hire, pay, fire, supervise or otherwise control the work of employee) with respect to an H-2A worker or a worker in corresponding employment; and

    **(3)**    Possesses, for purposes of filing an *Application for Temporary Employment Certification,* a valid Federal Employer Identification Number (FEIN).

20 C.F.R. §655.103(b).

80.     The concerns that animate the NLRA generally, and the "single employer" doctrine specifically, are completely distinct from the concerns animating the H-2A program. As the U.S. Court of Appeals for the Sixth Circuit explained in the Title VII context, in formulating and applying the single employer test, a court must "look to the purpose of the statute,

congressional intent, and the legislative history." *Ambruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983).

81.     According to the Congress that enacted the law, the purpose of the NLRA is "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. §151. The "single employer" test is invoked to assess whether two or more existing business entities should jointly be held to a single labor obligation, *Iowa Exp. Distribution*, 739 F.2d at 1310 (8th Cir. 1984), and the NLRB also invokes it to combine the amount of business of two or more employers so that the whole will exceed the NLRB's self-imposed jurisdictional minimum, *see, e.g., Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam). By contrast, the H-2A Program's purpose is "to assure agricultural employers an adequate labor force while at the same time protecting the jobs of U.S. workers." U.S. Gen. Accounting Office, The H-2A Program: Protections for U.S. Farmworkers, at 12 (1988). Applying the National Labor Relations Act does not require DOL to assess whether an employer's need is temporary or seasonal, which is one of the fundamental questions in H-2A adjudications.

82.     Defendants' statutory obligation is to determine whether (A) there are not sufficient workers who are able, willing, and qualified to perform the employer's needed labor; and (B) the employment of foreign nationals will not adversely affect the wages and working conditions of U.S. workers. 8 U.S.C. §1188. It is difficult to discern how a test originally

intended to fasten liability on employers in labor disputes could meaningfully serve those purposes.

83. As the Supreme Court has explained, "agency action must be based on non-arbitrary, 'relevant factors'" that are "tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011). A fundamental issue in cases like this, where the CO alleges a close relationship between two employers, is whether the H-2A applicant is a single employer with a year-round need. *Matter of Artee Corporation*, 18 I&N Dec. 366 (Comm'r 1983). For Defendants to apply, in the H-2A context, a test that does not even consider, let alone give substantial weigh to, whether, for example, Employer A's workforce can and does work for Employer B, or whether Employer A has a different peak need for labor than Employer B, is arbitrary and capricious. Such a test is "unmoored from the purposes and concerns of the [H-2A program]." *Judulang v. Holder*, 132 S. Ct. 476, 490 (2011). It is also unmoored from the regulatory definition of "employer" that applies in the H-2A program, because it does not require the agency to consider whether the employers maintain separate FEIN numbers or whether the employers listed the same point of contact on their H-2A applications.

84. A method for adjudicating H-2A applications that bears no relation to the purposes of the H-2A program is arbitrary and capricious. *Id.*

**D. Assuming the "Single Employer Test" is Permissible, Defendants' Failure to Consider Relevant Evidence and Properly Apply the Test Fails Substantial Evidence Review.**

85. Assuming, *arguendo*, that Defendants' "single employer test" is a permissible means of carrying out its statutory mandate, Defendants' decision denying Plaintiff's H-2A Application fails substantial evidence review.

86.     Agency factual findings are reviewed under the substantial evidence standard. 5 U.S.C. §706; *Kappos v. Hyatt*, 132 S. Ct. 1690, 1694 (2012). Such findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court is to "canvass[] 'the whole record' in order to ascertain" whether evidence in the record "fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "While the substantial-evidence standard of review is generous, it is not boundless; it does not allow an agency to close its eyes to on-point and uncontradicted record evidence without any explanation at all." *Fogo de Chao (Holdings), Inc., v. U.S. Dep't of Homeland Security*, 769 F.3d 1127, 1147 (D.C. Cir. 2014).

87.     Here, Defendants did precisely what the D.C. Circuit explained the substantial evidence standard of review forbids: they "close[d] [their] eyes to on-point and uncontradicted record evidence without any explanation at all." *Id.* Among other crucial evidence, Defendants failed to consider or address that Plaintiff's workers do not and cannot work at Maroa, that each entity hire and fires its own workers, that each entity has its own human resources team, and that each entity maintains its own financing, accounting, banking, and contracting. Exh. C.

88.     Beyond ignoring record evidence, Defendants failed to correctly apply the "single employer test." In *Swallows v. Barnes & Noble Book Stores, Inc.*, the Sixth Circuit demonstrated the proper way to apply the "single employer test." 128 F.3d 990 (6th Cir. 1997). In *Swallows*, plaintiffs were three employees discharged from their jobs with Barnes & Noble Book Stores, which was operating and managing a bookstore as an independent contractor for a state university, allegedly because of their age or disability in violation of the Age Discrimination in

Employment Act ("ADEA") and the Americans with Disabilities Act ("ADA"). 128 F.3d at 991-992. The plaintiffs brought suit against both the bookstore and the state of Tennessee through the university. *Id.*

89.     The district court dismissed the plaintiff's claims as against the university. Plaintiffs appealed, arguing that the university and bookstore were a single employer. *Id.* After laying out the four factors, the court emphasized that "control over labor relations is a central concern." *Id.* at 994. The court ruled that the university and the bookstore could not be treated as a "single employer" because (i) they each kept their own records, and maintained separate bank accounts and offices and therefore did not have interrelated operations; (ii) they did not share common management; (iii) the university did not have the power to hire and fire employees; and (iv) the two did not have a common owner within the meaning of the single employer test because "neither of the entities is a sham." *Id.* at 994-995.

90.     Applying *Swallows* to the facts presented in Plaintiff's application to DOL, it becomes evident that Plaintiff and Maroa are not a single employer. First, Plaintiff and Maroa maintain separate bank accounts and offices. Second, as Plaintiff's response to Defendants' NOD explained, "[t]he supervisors of Pepperco-USA, Inc., have the authority to hire, fire and discipline Pepperco-USA employees together with consultation from Pepperco-USA's human resource department.". Defendants do not acknowledge such facts in their decision, nor do they explain why such evidence fails to weigh in Plaintiff's favor.

91.     Next, neither entity is a "sham." This factor – whether the two entities share a common owner – "has been interpreted in this circuit as an inquiry into the legitimacy of the entities. If neither of the entities is a sham then the fourth test is not met." *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 572 (6th Cir. 1984). There is nothing in the

record to support the proposition that Plaintiff and Maroa are "shams." The sole factor that militates in favor of a finding that Maroa and Plaintiff are a single employer is that they share a president and certain other high level officers. But the fact remains that day-to-day operations and labor relations are controlled by the subsidiaries themselves. For these reasons, Plaintiff and Maroa are not a "single employer" when that test is properly applied.

## VII. **PRAYER**

WHEREFORE, Plaintiff prays that this Court:

1.      Declare unlawful and set aside Defendant DOL's decision to deny Plaintiff's H-2A Application;

2.      Order Defendant DOL to promptly readjudicate and approve Plaintiff's H-2A Application;

3.      Grant attorney's fees and costs of Court to Plaintiff under the Equal Access to Justice Act; and

4.      Grant such other and further relief as this Court deems proper under the circumstances.

Respectfully submitted this 27th day of April, 2016,

By counsel,_____/s/ Maria Fracassa Dwyer_____

Maria Fracassa Dwyer (P60946)
CLARK HILL PLC
500 Woodward Ave, Suite 3500
Detroit, MI 48226
T: 248.988.5899
F: 248.988.2339
E: mdwyer@clarkhill.com

Thomas K. Ragland
CLARK HILL PLC
601 Pennsylvania Avenue, NW
North Building, Suite 1000

Washington, DC 20004
T: 202.552.2360
F: 202.552.2384
E: tragland@clarkhill.com

Patrick Taurel
CLARK HILL PLC
601 Pennsylvania Avenue, NW
North Building, Suite 1000
Washington, DC 20004
T: 202.772.0903
F: 202.772.0901
E: ptaurel@clarkhill.com

David E. Einstandig (P47344)
THAV GROSS PC
30150 Telegraph Road, Ste. 444
T: 248.645.8232
F: 248.220.1410
E: deinstandig@thavgross.com

*Counsel for the Plaintiff*